[Crim. No. 13442. In Bank. Dec. 9, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
HENDERSON LYN FOWLER, Defendant and Appellant.

**COUNSEL**

James H. Newhouse, under appointment by the Supreme Court, and John D. Nunes, Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SULLIVAN, J.**—Defendant Henderson Lyn Fowler was charged by information with the crime of robbery. (Pen. Code, § 211.) A jury found him guilty as charged and determined that the crime was of the first degree. (See Pen. Code, § 211a.) Defendant was committed to the California Youth Authority for the term prescribed by law.[1] He appeals from the judgment of commitment. (Pen. Code, § 1237; see Welf. & Inst. Code, § 1737.5.)

In the instant case we interpret and apply the constitutionally grounded rules which were enunciated by the Supreme Court of the United States in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. We conclude that the commitment must be reversed because evidence obtained in violation of these rules was admitted at trial and such erroneous admission was not harmless within the meaning of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

About 9:30 p.m. on August 30, 1967, three young Negro men entered the lobby of the Edgewater West Motor Inn in Oakland. Two employees of the motel—Janice Miller, the desk clerk, and Helen Woodhall, the auditor and front desk manager—were conversing near the registration desk. One of the men asked them for change for the cigarette machine. Upon receiving the change he produced a gun, pointed it at the two women, and ordered them to raise their hands. He and one of his confederates then went behind the desk and the latter took some $177 from the cash drawer. The third man remained by the door of the lobby out of the direct view of the two women. After the cash drawer had been emptied the man with the gun asked where the "big money" was and his companion suggested a cabinet drawer, which proved to be empty. The two men then took some money from Miss Miller's

---

[1]Defendant was less than 21 years of age on the date of his apprehension and was, therefore eligible for such commitment. (See Welf. & Inst. Code, § 1731.5.)

purse and, ordering the two women to come out from behind the desk and remain there for five minutes, they departed along with their "lookout" man.

The office was well-lighted, and the robbers were there approximately ten minutes overall. The two men who went behind the registration desk were quite close to the two women during the robbery.

Police, who had been summoned by a patron of the nearby motel dining room, arrived within a few minutes after the robbers left. After the two women had given a general account of the robbery they were asked for descriptions of the robbers.[2] Neither was able to give any description of the man who had stood lookout, but each gave substantially identical descriptions of the two men who had gone behind the registration desk. The gunman was described as approximately 5 feet 8 inches in height, slender and delicate, with his hair combed high up on the front of his head. The man accompanying him behind the desk was said to be taller and heavier, perhaps 5 feet 10 inches in height and 190 pounds, with straight black hair. His clothing was described as dark or brown trousers and a dark blue brushed cardigan sweater. Neither woman was able to give significant details as to the facial characteristics of any of the robbers, although Miss Miller said that the gunman had "fine features."

On the next day Miss Miller and Mrs. Woodhall went to the police department where they were shown photographs of six or seven Negro males of the approximate age of the robbers.[3] Both chose a photograph of defendant Fowler and positively stated that he was the man who had accompanied the gunman behind the registration desk and who had taken the money from the cash drawer. After a brief interval, the women were shown a second group of from 12 to 14 photographs—apparently featuring defendant's known associates. From this group they selected a photograph of one Leon Gray as that of the gunman.[4]

On the basis of these identifications warrants were issued for the arrest of defendant and Leon Gray.

On September 5, 1967, Gray was arrested at his residence. Two days later he appeared in a lineup. Gray was by that time represented by the public defender's office, and prior to the lineup he was asked whether he

[2] Although the record indicates that the two women gave their descriptions "one after the other," it does not indicate whether or not the descriptions were given in the presence of each other.

[3] The two women were together when the photographs were shown to them.

[4] Mrs. Woodhall was uncertain of her identification of Gray. However, she was positive in her identification of defendant Fowler.

wished to have his counsel present.[5] Gray replied in the affirmative, the public defender's office was contacted, and a member of that office represented Gray at the lineup. However, counsel was not permitted to speak to the witnesses, Miss Miller and Mrs. Woodhall, prior to or during the lineup and was permitted to obtain their names and addresses only after the lineup had been concluded.

There were five participants in the lineup, including Gray. A photograph subsequently introduced into evidence shows that all of the participants were Negro men of the same approximate age and height, although there were differences in build and clothing, and Gray was slightly taller than the other participants. Each was required to speak words used by the gunman in the robbery.[6] After the lineup the two witnesses were individually approached by the inspector in charge and asked to whisper her identification, if any. Gray's counsel sought to overhear the words whispered by the inspector and each of the respective witnesses, but he was unable to do so. After the identifications had been made in this manner counsel was informed of the result, which he then confirmed with the two women. Miss Miller made a positive identification of Gray as the gunman.[7] Mrs. Woodhall, however, was less positive in her identification, and Gray was released.

On September 11, 1967, defendant Fowler went to the police and surrendered himself. He was taken to an interrogation room and, after being advised of his *Miranda* rights (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), gave a statement in which he proffered an alibi and denied involvement in the robbery. Later that evening he appeared in a lineup and was positively identified by Miss Miller and Mrs. Woodhall as the man who had come behind the registration desk with the gunman and had taken the money from the cash drawer.

No counsel was present on defendant's behalf at the lineup of September 11. Immediately before the lineup defendant was asked whether he was

---

[5]This inquiry was made, and counsel provided, pursuant to regulations issued by the police department governing the conduct of lineups. These regulations were promulgated following the *Wade* and *Gilbert* decisions, and will be discussed in detail *infra*.

[6]Gray's counsel testified on the motion to suppress identification evidence and at trial. He indicated he thought the Gray lineup was on the whole fairly conducted except for differences in dress and appearance among the participants. He further testified that at the time of the lineup he did not know how the robbers had been dressed, what words had been used during the robbery, and whether any prior identification by means of photographs had occurred.

[7]Miss Miller testified at trial that she was not told that the Gray lineup was directed toward identification of the gunman, but that she deduced this because of the words which the participants were required to repeat.

represented by an attorney and he replied that he was not. However, defendant was not told that if he so desired, an attorney would be appointed to represent him at the lineup.[8]

There were five participants in this lineup, including defendant Fowler. A photograph subsequently introduced into evidence shows that all of the participants were Negro men of the same approximate age and height. There were differences in clothing, however, and defendant was the only participant of a heavy build. Each was required to speak words used by the robber who had accompanied the gunman behind the registration desk. As indicated above Miss Miller and Mrs. Woodhall both identified defendant as the robber in question.[9]

At trial and after the jury had been empanelled defendant made a motion to suppress evidence of the lineup identification on the authority of *United States* v. *Wade, supra,* 388 U.S. 218, and *Gilbert* v. *California, supra,* 388 U.S. 263. The motion was heard out of the presence of the jury. Testimony was taken from various persons involved in the lineup proceedings[10] and the facts appeared substantially as set forth above. Defendant contended that evidence of his lineup should be suppressed because counsel was not present. He further contended that he should have been advised prior to the lineup that, because he was not represented by an attorney, an attorney would be appointed to be present at the lineup in his behalf. The motion

---

[8]The police lineup regulations to which we have referred in footnote 5, *ante,* and will refer in detail *infra*—provided in essence that lineups would be conducted in the presence of counsel only when the subject "has" an attorney.

After Gray's arrest but before his lineup on September 7, defendant contacted attorney Clarence Davis and requested that he, Davis, call the police in order to determine whether Gray had been charged and whether he, Fowler, was wanted. Davis did so and was told that Fowler was wanted and could appear in a lineup that evening if he desired to surrender himself. Defendant apparently did not so desire at that time, but after he spoke with Gray on the next day and heard of the latter's lineup experience at the police station, he surrendered himself on September 11. Prior to the lineup on that day the police contacted attorney Davis, informed him that defendant was in custody and was scheduled to appear in a lineup, and asked whether he represented defendant. Davis replied that he did not.

It appears that on the day of the robbery defendant had been held to answer on a charge of possession of marijuana, and that on September 11 he was free on his own recognizance awaiting trial in that matter. Defendant was represented by the public defender in the narcotics matter. At the trial of the instant case, he testified that he informed the officer who interrogated him upon his arrival at the police station —and who conducted the subsequent lineup—of this fact. The officer, Inspector Madsen, testified that he was not so informed by defendant and that he had no knowledge of the marijuana proceeding.

[9]Both women were aware that the September 11 lineup was for the purpose of identifying the man who accompanied the gunman behind the registration desk and who emptied the cash drawer.

[10]Miss Miller; Mrs. Woodhall; Inspector Madsen, who had conducted both the Gray and the Fowler lineups; Frank Kox, the assistant public defender who had been present at Gray's lineup; and defendant himself.

was denied, and the court also denied a motion to prepare a transcript of the proceedings on the motion for use at trial.

During the prosecution's case in chief both Miss Miller and Mrs. Wood-hall made an in-court identification of defendant as the robber who came behind the registration desk and emptied the cash drawer. Both women also identified the photographs of Gray and defendant which they had selected from the police files on the day after the robbery. Finally, both women testified regarding the two lineups at which they had identified Gray and defendant.

All other persons who had testified on the motion to suppress also testified at trial. At the close of the prosecution's case in chief defendant moved to strike the testimony of Miss Miller, Mrs. Woodhall, and Inspector Madsen, on the ground that he had been denied effective cross-examination in violation of the confrontation clause of the Sixth Amendment by the court's refusal to allow preparation of a transcript of the proceedings on the motion to suppress. The motion to strike was denied.

Defendant testified at the trial. He denied guilt and claimed that he was at home with his family and Leon Gray at the time of the robbery. Members of the family testified in support of this alibi, but Gray, called in rebuttal, denied that he was with defendant on the night in question.

As previously stated, the jury found defendant guilty of robbery in the first degree, and the court committed him to the California Youth Authority. This appeal followed.

In *United States* v. *Wade, supra,* 388 U.S. 218, the United States Supreme Court held five to four that a federal judgment convicting defendant Wade of bank robbery should be vacated because he had been required to appear in a post-indictment lineup, without the presence of his counsel or a valid waiver thereof—which lineup was therefore conducted in violation of defendant's Sixth Amendment rights; that certain *in-court identifications* were erroneously admitted unless it could be shown upon remand that they had an origin independent of the illegal lineup; and that, if the *in-court identifications* had no independent origin, the judgment should be reversed unless it was determined that their erroneous admission was harmless. In *Gilbert* v. *California, supra,* 388 U.S. 263, the high court held six to three that a state judgment convicting defendant Gilbert of murder and armed robbery should be vacated because of the admission during the prosecution's case in chief of *evidence of a post-indictment lineup* in which defendant had been required to appear without the presence of his counsel or a valid waiver thereof—such admission being per se erroneous—and that the judgment should be reversed unless it was determined upon remand that the error was harmless.

■ The first question pertinent to our interpretation and application of these cases in the instant context is whether the "post-indictment" language used throughout the opinions is to be considered as setting forth the legal limits of the enunciated rules, or whether that language is to be deemed merely descriptive of the factual situations involved in the *Wade* and *Gilbert* cases. If the rules in question are applicable only to lineups occurring *after* indictment, it is clear that they have no application in the instant case.

We have concluded that the *Wade-Gilbert* rules are not limited in their application to lineups occurring after indictment. Our reasons are several. First, and perhaps most importantly, we find nothing in the reasoning of those opinions, and have ourselves been able to conceive of no reason, requiring that the rules should be so limited. The presence or absence of those conditions attendant upon lineups which induced the high court to term such proceedings "a critical stage of the prosecution" at which the right to counsel attaches (388 U.S. at p. 237 [18 L.Ed.2d at p. 1163]) is certainly not dependent upon the occurrence or nonoccurrence of proceedings formally binding a defendant over for trial.[11] A lineup which occurs prior to the point in question may be fraught with the same risks of suggestion as one occurring after that point, and may result in the same far-reaching consequences for the defendant.[12]

Second, we consider that the review of authorities and concluding language contained in part II of the *Wade* opinion manifests an intention to state principles governing *any* confrontation by one suspected of crime with the witnesses against him at trial.[13] It is there indicated that the right at

---

[11] Indeed, we find support for our conclusion that the "post-indictment" language in *Wade* and *Gilbert* is descriptive rather than limiting in the fact that there is no mention made of *information,* as opposed to indictment. If the high court had considered that the conditions requisite to the attachment of the right to counsel are present only after the defendant has been bound over for trial, we think it would have made reference to *both* of the procedures commonly used for that purpose.

[12] It has been held in the federal sphere that evidence obtained as a result of a lineup conducted without observance of the *Wade-Gilbert* rules during a period of detention violative of rule 5 of the Federal Rules of Criminal Procedure is to be excluded under the *McNabb-Mallory* rule to the same extent that it would be excluded in the state sphere under *Wade* and *Gilbert*. (*United States* v. *Broadhead* (7th Cir. 1969) 413 F.2d 1351; see *Adams* v. *United States* (D.C. Cir. 1968) 399 F.2d 574, especially concurring opinion of Burger, Circuit Judge; but see *Williams* v. *United States* (D.C. Cir. 1969) 419 F.2d 740. Indeed, in *Broadhead* the court stated: "[T]here was no distinction between the *Wade* taint and the taint of a Rule 5 violation." (413 F.2d at p. 1359.) Because nearly all, if not all, rule 5 violations occur prior to formal accusation it is clear that these decisions manifest a conclusion that the protections elucidated in *Wade* are as necessary at the pre-accusation stage as they are at the post-accusation stage.

[13] We do not suggest that the *rules* enunciated to govern lineups were meant to

issue in all such confrontations—and therefore the right to be protected—is the defendant's "most basic right as a criminal defendant—his right to a fair trial at which the witnesses against him might be meaningfully cross-examined." (388 U.S. at p. 224 [18 L.Ed.2d at p. 1155].) After reviewing a number of cases wherein the protection of the indicated right required the presence of counsel or the valid waiver thereof, including *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *Miranda* v. *Arizona, supra,* 384 U.S. 436 (in both of which the right to counsel attached in *pre*-indictment proceedings), the court concluded that the principle of those cases "requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." (388 U.S. at p. 227 [18 L.Ed.2d at p. 1157].) (Original italics.)

Third, we note that in *Wade* the dissenting and concurring opinion of Justice White (joined by Justices Harlan and Stewart) contains the following language: "The rule applies to any lineup, to any other techniques employed to produce an identification and *a fortiori* to a face-to-face encounter between the witness and the suspect alone, regardless of when the identification occurs, in time or place, and whether before or after indictment or information." (388 U.S. at p. 251 [18 L.Ed.2d at p. 1171].) While we do not number among the general canons of wise judicial interpretation that of utilizing a dissenting opinion to divine the meaning of the majority, we believe that in the *Wade* case the reticence of the majority to meet the charge above quoted is not without significance.[14] At the least it may fairly be concluded that the majority saw no startling inconsistency between its opinion and the assertion of Justice White that the rules announced applied to lineups conducted "whether before or after indictment or information"—and that therefore the majority considered its "post-indictment" language descriptive rather than limiting.

Fourth, the case of *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], decided on the same day as *Wade* and *Gilbert,* gives

---

govern all pretrial confrontations—whether or not in a lineup context. We do suggest that the *principles* informing rules governing *lineups* are broadly applicable to all pretrial confrontations.

[14]We should be more reluctant to reach this conclusion if the majority had taken no notice at all of the arguments of the dissenters. In at least one point, however, the majority opinion took occasion to meet express language of the dissenting opinion. (388 U.S. at p. 241, fn. 33 [18 L.Ed.2d at p. 1165].)

some indication that the high court has no intention of limiting the operation of the *Wade-Gilbert* rules to post-indictment lineups. There a man was stabbed to death and his wife seriously wounded by an assailant who left certain objects at the scene. Defendant was traced through these objects and arrested on the following day. The wife underwent major surgery necessary to save her life, and on the day following defendant's arrest—prior to arraignment and before he could retain counsel—he was taken alone to her hospital room and identified by her as the assailant. The high court, in holding that the *Wade-Gilbert* rules were to have purely prospective application from the date of the decisions and that defendant (a habeas corpus petitioner) therefore could not benefit from them, strongly inferred that such rules would have governed the factual situation at bench if they had been given retroactive application or if the confrontation in question had taken place subsequent to the *Wade* and *Gilbert* decisions. (See also *Rivers* v. *United States* (5th Cir. 1968) 400 F.2d 935, 940.)

Fifth and finally, we think it clear that the establishment of the date of formal accusation as the time wherein the right to counsel at lineup attaches could only lead to a situation wherein substantially all lineups would be conducted prior to indictment or information. We cannot reasonably suppose that the high court, recognizing that the same dangers of abuse and misidentification exist in *all* lineups, would announce a rule so susceptible of emasculation by avoidance.

For the foregoing reasons we have concluded that the "post-indictment" language in the *Wade* and *Gilbert* opinions is simply descriptive of the facts before the court in those cases and was not meant to limit the operation of the rules announced.[15] We further conclude that those rules are wholly applicable to the formal pre-accusation lineup here in question.[16]

---

[15]We reach this conclusion with full knowledge of, and all due respect for, contrary decisions in other jurisdictions. (See, e.g., *People* v. *Palmer* (1969) 41 Ill.2d 571 [244 N.E.2d 173]; *State* v. *Boens* (1968) 8 Ariz.App. 110 [443 P.2d 925]; cf. *People* v. *Crosslin* (1967) 251 Cal.App.2d 968-981 [60 Cal.Rptr. 309].)

[16]We specifically do not here decide the extent to which the *Wade-Gilbert* rules are applicable to pretrial confrontations occurring out of the context of a formal lineup. We observe that decisions in this and other jurisdictions have declined to apply the rules in certain nonlineup contexts wherein confrontations have occurred shortly after the commission of the crime or in other circumstances making prompt identification necessary or desirable. (See, e.g., *Russell* v. *United States* (D.C. Cir. 1969) 408 F.2d 1280; *United States* v. *Davis* (2d Cir. 1968) 399 F.2d 948; *People* v. *Almengor* (1969) 268 Cal.App.2d 614 [74 Cal.Rptr. 213]; *State* v. *Boens, supra,* 8 Ariz. App. 110 [443 P.2d 925]; *Commonwealth* v. *Bumpus* (1968) 354 Mass. 494 [238 N.E.2d 343]; *State* v. *Bertha* (1969) 4 N.C.App. 422 [167 S.E.2d 33]; cf. *Rivers* v. *United States, supra,* 400 F.2d 935; also compare *Palmer* v. *State* (1969) 5 Md.App. 691 [249 A.2d 482] with *Tyler* v. *State* (1968) 5 Md.App. 265 [246 A.2d 634].) We believe that

■ Moreover, we think it manifest that when the right to counsel at lineup has attached, the suspect is entitled to be so notified and to be notified that counsel will be appointed if necessary. Only if he is so notified can his election to proceed in the absence of counsel be deemed an intelligent waiver of the accrued right. (*United States* v. *Wade, supra,* 388 U.S. 218, 237 [18 L.Ed.2d 1149, 1163, 87 S.Ct. 1926]; see *Rivers* v. *United States, supra,* 400 F.2d 935, 940.)[17]

■ The People further contend that Fowler's lineup in the instant case was not a "critical" stage of the proceedings, and that the right to counsel did not attach, because the lineup was conducted in substantial compliance with police regulations promulgated to insure its fairness.

In the *Wade* case Mr. Justice Brennan, speaking for the court, stated: "Legislative or other regulations, such as those of local police departments, which eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as 'critical.' But neither Congress nor the federal authorities have seen fit to provide a solution. What we hold today 'in no way creates a constitutional strait-jacket which will handicap sound efforts at reform, nor is it intended to have this effect.' *Miranda* v. *Arizona, supra,* at 467." (Fn. omitted.) (388 U.S. at p. 239 [18 L.Ed.2d at p. 1164].)

On August 18, 1967—a little more than two months after the *Wade* decision—the Oakland Chief of Police issued a general order which sought to establish lineup regulations "in order to promote fairness, eliminate witness suggestion, and document the proceedings for use in court."

The regulations in question cover six pages of letter-size paper and are broken down into two major subdivisons. The first of these subdivisions is

---

the proper determination of whether the *Wade-Gilbert* rules (regarding attachment of the Sixth Amendment right to counsel) rather than the *Stovall* rule (requiring basic due process in all pretrial confrontations) are applicable to a particular case, will be achieved only by a careful balancing of the need for a prompt nonlineup identification in light of the circumstances, against the need for and ability of counsel to help avoid erroneous identification. Each case will of necessity call upon the courts "to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." (*United States* v. *Wade, supra,* 388 U.S. 218, 227 [18 L.Ed.2d 1149, 1157, 87 S.Ct. 1926].)

[17]Then Circuit Judge Burger, concurring in *Adams* v. *United States* (D.C. Cir. 1968) 399 F.2d 574 (see fn. 12, *ante*), considered that the element of warning implicit in the *Wade-Gilbert* rules required the holding that lineups conducted during periods of rule 5 violation could not produce admissible evidence. "Now that the right to counsel is an integral part of the lineup procedure, the warnings that are given at presentment and the opportunity to have counsel appointed are highly relevant to the lineup situation." (399 F.2d at p. 580.)

directed to the investigator conducting the lineup and seeks to outline his duties and responsibilities. It is provided inter alia that prior to the lineup the investigator shall determine whether the subject "has" an attorney and, if so, that he shall contact the attorney and, if possible, arrange for the attendance of the attorney or his substitute at the lineup;[18] that he shall show a copy of the regulations to counsel upon his arrival at the lineup room but shall request counsel "to refrain from asking questions" during the proceedings and inform him that all questions will be answered by the investigator after the participants have left the room after the lineup; and that if counsel has "any objections regarding the proceedings" he shall be referred to the investigator's superior or to the patrol division watch commander.

The regulations also provide that certain instructions are to be given to the witnesses before the lineup: They are to be informed that they are to view a lineup, but they are not to be informed that any person in the lineup is believed responsible for the crime. They are not to point to any participant or make motions indicating that a particular participant is identified. They are not to speak to any person in the room except the investigator when he directs questions to them.

As to the conduct of the lineup itself, the regulations provide that the participants are to be numbered as they stand on the stage; that each participant is to perform identical actions of facing and walking; that if words were used or specific articles of clothing were worn in the commission of the offense, each participant is to speak such words or wear such articles; and that each participant shall speak other words or perform motions if any witness so desires. After the lineup is completed at least two photographs are to be taken "of the show-up line." Then, after the participants have been removed, the investigator is instructed to "[i]nterview each witness and complainant separately and in the presence of the subject's attorney in attendance, if he so requests." The results of this interview, together with a notation of any special requests made by witnesses during the lineup, are to be entered on a form to be filed in the case jacket.

The second major portion of the regulation is directed to the jail division and outlines its responsibilities upon being notified by the investigator that a lineup is to be held. It provides inter alia that five persons in addition to the "subject" or subjects are to be chosen and that each shall be "closely similar in type, particularly in age, height, weight, race, complexion, physical pecularities and dress."

---

[18] The regulations do not provide that the subject shall be informed of his right to counsel at the lineup or that counsel will be appointed for one who "has" none and desires the attendance of counsel at the lineup.

The People contend that these regulations, promulgated in response to the language of Mr. Justice Brennan above quoted, set up constitutionally adequate safeguards for insuring the fairness of lineup procedures in that they "eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial" and thereby "remove the basis for regarding the [lineup] stage as 'critical.'" (388 U.S. at p. 239 [18 L.Ed.2d at p. 1164].) We do not agree.

It is manifest that the indicated language of *Wade* must be read in conjunction with part III of the opinion, which undertakes to distinguish lineup identification procedures from scientific examination procedures involving analysis of "fingerprints, blood sample[s], clothing, hair, and the like." (388 U.S. at p. 227 [18 L.Ed.2d at p. 1158].) It is there concluded that, as to the latter types of procedures, "Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." (388 U.S. at pp. 227-228 [18 L.Ed.2d at pp. 1157-1158].) Thus, as *Wade* states, such procedures are not "characterized as critical stages at which the accused has the right to the presence of his counsel." (388 U.S. at p. 227 [18 L.Ed.2d at p. 1157].) On the other hand, as the court points out in part IV of its opinion, lineup identification procedures have not evolved within the context of scientific techniques capable of expert scrutiny at trial. For this reason they are characterized as "critical": because the procedure itself lacks a scientific context of high reliability capable of scrutiny at trial through expert witnesses, the function of insuring fairness and accuracy devolves upon counsel through the requirements of the Sixth Amendment.

Viewed in this light, it is clear that the court's language concerning "regulations" (found at the end of part IV) has reference to the development of eyewitness identification procedures of a high order of reliability comparable to that obtaining in scientific examination procedures. This conclusion is buttressed by the court's footnote 30 on page 239 of its opinion. This footnote is attached to the sentence of the court's opinion wherein it envisions the possibility of legislative or other regulations which might remove the basis for regarding a lineup confrontation as a "critical" stage, and it summarizes a "scientific method" of pretrial identification first advanced by Wigmore which utilizes a series of talking films instead of actual face-to-face confrontation. (See Wigmore, The Science of Judicial Proof (3d ed. 1937).) The footnote concludes as follows: "Of course, the more systematic and scientific a process or proceeding, including one for

purposes of identification, the less the impediment to reconstruction of the conditions bearing upon the reliability of that process or proceeding at trial. See discussion of fingerprint and like tests, Part III, *supra,* and of handwriting exemplars in *Gilbert* v. *California, supra.*" (388 U.S. at p. 239, fn. 30 [18 L.Ed.2d at p. 1164].)
1164].)

We do not believe that the police regulations here in question are of the nature contemplated by the United States Supreme Court which would be sufficient to "remove the basis for regarding the [lineup] stage as 'critical' " and thus remove the necessity for the presence of counsel to insure fairness and reliability. (388 U.S. at p. 239 [18 L.Ed.2d at p. 1164].) Even if we assume for purposes of argument that these regulations provide substantive standards which ·*if followed* would insure a fair lineup, the United States Supreme Court has made it clear that a constitutionally adequate substitute for the presence of counsel at the lineup, in order to preserve a meaningful confrontation at trial, must provide for a means whereby the defendant can have an opportunity at trial to effectively reconstruct the procedure by which he was identified in a pretrial lineup. (See 388 U.S. at pp. 231-232 [18 L.Ed.2d at pp. 1159-1160].) The regulations in question do not provide such a means.

It is the Attorney General's suggestion that an adequate reconstruction may be effected in the context of a requirement that the prosecution, prior to the admission of evidence of a lineup or a courtroom identification based upon a lineup, demonstrate "substantial compliance" with regulations such as those before us. As we understand the contention, it is contemplated that prior to the admission of such evidence, and upon objection that it is based upon an unfair lineup, 'the court would hold a hearing out of the presence of the jury wherein testimony would be taken from persons involved in the lineup (presumably including police officers who conducted the lineup, witnesses who attended the lineup, and the defendant himself) and still photographs of the composition of the lineup would be introduced. Defense counsel, who would be provided with a copy of the regulations in question, would have the opportunity to examine or cross-examine such witnesses on the basis of such regulations in order to determine whether they were followed in the lineup at issue. Following this hearing—so the suggestion of the Attorney General continues—-the court would make a determination. If it concluded that the regulations were substantially complied with it would overrule the defense objection to the proffered evidence; if it concluded that there was no substantial compliance it would sustain the objection and exclude the evidence.

We do not believe that the procedure suggested by the Attorney General would provide the kind of opportunity for reconstruction of a pretrial

lineup at trial which is a requisite to a constitutionally adequate substitute for counsel's presence at such a lineup. His opportunity for cross-examination on the basis of the cold regulations provided to him could amount to little more than shooting in the dark, for he would have no idea as to which facets of the pretrial confrontation might contain elements of unfairness. We do not intimate that law enforcement officers would deliberately introduce into the lineup procedure techniques not specifically dealt with in the regulations which might prove to be unfair to the suspect; our concern centers more on the possibility that such unfair techniques might slip into the procedure through inadvertence or neglect. Counsel provided only with the cold regulations could have no effective way of ascertaining the fact and extent of such developments. The only person at the lineup who might be particularly sensitive to specific unfair procedures is the defendant himself, and his ability to recognize such procedures is generally speaking impaired by a number of factors among which might be numbered his natural apprehension at the time of the confrontation, his unpracticed eye in such matters, and in some instances his complete inability to achieve accurate perception because of the use of such devices as one-way mirrors and bright footlights. We cannot conclude that the limited opportunity for reconstruction afforded by the suggested procedure renders that procedure, and the regulations on which it depends, one which "eliminate[s] the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial [and thereby] remove[s] the basis for regarding the state as 'critical.'" (388 U.S. at p. 239 [18 L.Ed.2d at p. 1164].)[19]

█ We hold that the lineup of September 11, 1967, wherein defendant was identified by Miss Miller and Mrs. Woodhall, was conducted in violation of defendant's Sixth Amendment rights because counsel was not present in his behalf and because defendant did not intelligently waive his right to the presence of counsel. █ It was error of constitutional magnitude to admit *evidence of the lineup itself,* and, under the rules announced by the United States Supreme Court, that error cannot be cured by any showing that the subsequent *in-court identification* had a source

[19] We do not address ourselves in this case to the difficult and perplexing problems which can be expected to arise relative to the role to be played by counsel in the actual lineup process. (See generally Note: *Lawyers and Lineups* (1967) 77 Yale L.J. 390, 396-398; Note: *Counsel at Lineup* (1968) 63 Nw. U.L.Rev. 251, 259-261; see also *United States* v. *Allen* (D.C. Cir. 1969) 408 F.2d 1287, 1289-1290.) For the present we merely reiterate what was suggested in *Wade* relative to the purpose underlying the rule: the presence of counsel at a lineup is required in the absence of other suitable protective measures "to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." (388 U.S. at p. 227 [18 L.Ed.2d at p. 1157].) We assume that counsel's function and role at the lineup itself will be determined in future cases within the context of this purpose. .

independent of the illegal lineup. (*Gilbert* v. *California, supra,* 388 U.S. 263, 272-274 [18 L.Ed.2d 1178, 1186-1187, 87 S.Ct. 1915].) ▉ The judgment must therefore be reversed unless the People can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The People have not sustained their burden in this regard. There was no evidence connecting defendant with the robbery of the Edgewater West Motor Inn other than the identification evidence—and identification was the sole issue at trial. Furthermore, defendant presented an alibi supported by a number of witnesses, and the only evidence impeaching this alibi was out of the mouth of Leon Gray, whose testimony was clearly subject to doubt because of his obvious motive for disassociating himself from defendant. In these circumstances we cannot declare it clear beyond a reasonable doubt that the lineup evidence did not contribute to the verdict obtained.

Upon retrial *in-court identification* evidence on the part of the two witnesses in question will be admissible only if the prosecution is able to show out of the presence of the jury that such identifications had a source independent of the improper lineup. (*United States* v. *Wade, supra,* 388 U.S. 218, 239-243 [18 L.Ed.2d 1149, 1164-1166, 87 S.Ct. 1926]; *Gilbert* v. *California, supra,* 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951].) Questions on retrial concerning the admissiblity of evidence of pretrial photographic identifications, and the effect of such identifications upon in-court identification, will be governed by the opinion of the United States Supreme Court in *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967].

The judgment of commitment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment.