112 N.J. Super. 523 (1970)
271 A.2d 911
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EMANUEL EARLE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1970.
Decided December 18, 1970.
*524 Before Judges KILKENNY, HALPERN and LANE.
Mrs. Sonia Napolitano, Assigned Attorney, argued the cause for appellant (Messrs. Teltser, Byrne & Greenberg, attorneys).
Mr. Richard F. Thayer, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by HALPERN, J.A.D.
Defendant appeals from a judgment of conviction for atrocious assault and battery in violation *525 of N.J.S.A. 2A:90-1. He was sentenced to State Prison for not less than five nor more than seven years.
A summary of the essential facts testified to by the victim, Joseph Lancellotti, follows: He was employed as a patrolman by the Lehigh Valley Railroad. Shortly after midnight, on June 9, 1968, while inspecting freight cars in the Newark railroad yard he saw two men stacking boxes in a freight car in an area partially illuminated by floodlights. He approached them with a lighted flashlight in one hand and a revolver in the other. He identified himself and ordered the two men to step down. Within seconds thereafter he was struck from behind with a hard object causing him to drop the flashlight. He was then kicked and severely beaten with a lead pipe and dragged across the ground causing injury to his chest, legs and side. Before losing consciousness he fired all the bullets in his gun, and threw it away when he heard one of the attackers say "Dixon, get his gun and kill him." He was of the opinion that four men participated in the attack.
The following day he made a written report to his employer setting forth what had transpired but describing only one of his attackers (admittedly, not the defendant). At about the same time he gave an oral statement of the occurrence to the police and the other railroad patrolmen together with a description of the four attackers. In his court testimony, which was not too clear, he described them thusly  one was "five seven, five eight, approximately 40 years old wearing a white T-shirt. I've described too as being large negro males. * * * and the other being approximately six feet tall, wearing a T-shirt, short hair and a mustache." The last described person was presumably the defendant. Over a period of about seven months he viewed approximately 200 photos, and looked at about 15 men who had been arrested on railroad property for breaking and entering, but was unable to make an identification.
On January 4, 1969 the victim was informed by another railroad employee, John Pugh, that he had just arrested a *526 trespasser who resembled the description of one of the attackers. Pugh told him the trespasser was abusive and had tried to attack him. Pugh testified he described the trespasser to the victim as being a light skinned "colored" male, with a mustache, with very close knit hair, and big in size.
The victim went to police headquarters and identified defendant who was then in a cell with two other black men. One of the men was short and in handcuffs, the other was tall and thin with a conspicuous scar running from his forehead to his cheek. Admittedly, the defendant was then under arrest and in police custody for trespassing, and under suspicion for attacking the victim about seven months ago; he was not represented by counsel, or advised of his right to counsel.
The victim testified that his identification of defendant was based on seeing him by the freight car and observing him while being beaten and dragged. This version of what had transpired differed from the report made to his employer wherein he stated "* * * I identified myself as a police officer and told the men inside the car they were under arrest and to come out of the car slowly. The two men in the car immediately raised their hands in the air, turned around with their backs to me and began to climb out of the car. The first one out of the car turned around and faced me when he reached the ground and I saw he was a male negro, 5'7" or 5'8" in height, approximately 175 pounds, about 40 years of age, wearing a white T-shirt * * *." We note again that the only described attacker in the report was not the defendant.
The pivotal testimony concerned defendant's identification. The victim, without objection by defendant, made an in-court identification of defendant as being one of his attackers. When asked on direct examination about the confrontation at police headquarters the defendant objected contending it was improper under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and the companion *527 cases. The transcript reveals the following colloquy out of the jury's presence:
Mr. Higgins: your honor, this seems to me to be a situation that comes under Wade and Stokely.
The Court: No, it doesn't. This is in the cell. This isn't a lineup.
Mr. Higgins: This is similar to a lineup. He looked at three men in a cell.
The Court: No, it isn't. If that be your objection, it is overruled.
We are left with the inference that if a formal lineup had taken place the court would have held a taint hearing.
The victim, and thereafter Pugh, testified on direct examination concerning the confrontation in the cell at police headquarters. The State attempts to justify the court's ruling upon the ground that defendant was in custody of the police for a different offense, hence Wade did not apply.
We have determined that the court erred in allowing into evidence the testimony concerning the pretrial confrontation, requiring a reversal and a new trial. The defendant was under arrest and in police custody, albeit it was for another offense, and, absent an appropriate waiver, he was entitled to the assistance of counsel before the confrontation took place. Clemons v. United States, 133 U.S. App. D.C. 27, 408 F.2d 1230, cert. den. 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); United State v. Wade, supra; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). See State v. Wilbely, 112 N.J. Super. 216 (App. Div. 1970) decided November 16, 1970, in which case this court reversed a conviction because the police knew defendant had counsel, but held a pre-indictment lineup without the knowledge or consent of counsel.
The court in Mathis, in discussing the effect of questioning a defendant who is being held for an entirely different offense said: "These differences are too minor and shadowy to justify a departure from the well-considered conclusions *528 of Miranda with reference to warnings to be given to a person held in custody." (391 U.S. at p. 4, 88 S.Ct. at p. 1505). This is true even though it occurred prior to indictment. United States v. Zeiler, 427 F.2d 1305 (3 Cir.1970); United States v. Ayers, 426 F.2d 524 (2 Cir.1970); People v. Fowler, 1 Cal.3d 335, 82 Cal. Rptr. 363, 461 P.2d 643 (Cal. Sup. Ct. 1969).
The State having offered the pretrial identification testimony as substantive proof on its direct case it called into play the exclusionary rule in Gilbert. In Wade, supra, the pretrial confrontation testimony was elicited on cross-examination, whereas in Gilbert some of the pretrial confrontation was elicited on the Government's direct case. In establishing the exclusionary rule the court in Gilbert stated (388 U.S. 272-273, 87 S.Ct. 1956):
The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. We there held that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup. However, as in Wade, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error.
Quite different considerations are involved as to the admission of the testimony of the manager of the apartment house at the guilt phase and of the eight witnesses at the penalty stage that they identified Gilbert at the lineup. That testimony is the direct result of the illegal lineup "come at by exploitation of [the primary] illegality." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441, 455. The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement *529 authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.
The exclusionary rule in Gilbert requires a reversal of defendant's conviction and a new trial unless we can find from all the evidence that there was harmless error. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We turn to the evidence with this view in mind. The victim was the only State's witness to the attack so that his testimony requires careful scrutiny. The totality of the circumstances surrounding the attack casts doubt upon the victim's ability to identify his assailants. The occurrence of the attack in a railroad yard shortly after midnight; the discrepancy in the victim's story as to seeing defendant's face; the description given in his report of one other than defendant; and the lapse of about seven months until he saw defendant in the cell at police headquarters makes it questionable that he could identify defendant considering the opportunity he had and the circumstances under which he saw defendant.[1] Finally, and most significant is the fact that Pugh was provoked by defendant for giving him a hard time when arrested. Pugh described in detail defendant's appearance to the victim before the identification was made. The two men in the cell with defendant were so different in appearance than defendant that the victim had little alternative but to select the defendant. Since lineups for identification purposes are a recognized and approved police practice, any confrontation for that purpose must be carried out with fundamental fairness and without suggestion or procedure that will likely result in a misidentification. *530 Once a witness misidentifies a suspect the probability is great that he will not retreat from that position. Wade, supra, at 388 U.S. p. 229, 87 S.Ct. 1926. Since each case must be decided on its own facts, we have concluded that the totality of the circumstances here present did not measure up to the standards of fundamental fairness, resulting in a denial of due process to defendant. Therefore, we are unable to say that the admission of the pretrial identification was harmless error.
We have considered the other grounds for appeal raised by defendant but find it unnecessary to pass upon them. We comment in passing, since it happens too frequently, that prosecutors should refrain from mentioning or commenting that defendant did not testify unless something has occurred during the trial which requires it. See State v. Schultz, 46 N.J. 254 (1966), cert. den. 384 U.S. 918, 86 S.Ct. 1367, 16 L.Ed.2d 439 (1966); State v. McElroy, 96 N.J. Super. 582, 585 (App. Div. 1967), certif. den. 53 N.J. 512 (1969).
Reversed and remanded for a new trial.
NOTES
[1] In discussing the element of lapse of time the court in Phipps v. Follette, 428 F.2d 912, 915 (2 Cir.1970) stated: "Lapse of time between the crime and the confrontation is also important; the longer the interval, the greater the dangers that the initial image will have dimmed and that the second image will play a significant role. Also, a long interval between the initial observation and the trial coupled with an improper confrontation a comparatively short time before the witness appears in court enhances the danger that he may be relying on his most recent encounter."