[Crim. No. 3518.   Fourth Dist., Div. One.   Apr. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GREGORY LEE HARRIS et al., Defendants and Appellants.

Patrick J. Briggs and Kevin W. Midlam, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William L. Zessar, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Gregory Lee Harris (Harris) and Clarence Edwards (Edwards) appeal from judgments committing them to state prison following their conviction of robbery by verdict.

They were charged and tried jointly and both were found guilty of robbery in the first degree committed while they were armed with a deadly weapon. Edwards was charged separately with possession of marijuana and with possession of restricted drugs committed on the same date as the robbery, and was found guilty of those additional offenses.

### FACTS

Evidence viewed most favorably to the respondent shows the following facts:

On February 2, 1968, Roger McDowell worked as an attend-

ant at an American Oil Company gasoline service station from 3 p.m. to 12 midnight. The station was located at the southwest corner of the intersection of National Avenue, running east-west, and 43d Street, running north-south.

McDowell was the only attendant in the station when he first saw Harris and Edwards at about 9:30 p.m.; they were walking across the service station lot to the sidewalk in front of a liquor store where they remained standing in front of the liquor store around the corner on 43d Street about 75 to 100 feet from the gas station. McDowell noticed the two men from time to time still standing in front of the liquor store until at about 11 McDowell began to make preparation for closing the station for the night. After McDowell had been so engaged for some time, Harris and Edwards walked back across the station lot and west on National Avenue. When McDowell came out of the service station building, after having brought in some of the portable accessories, he saw the two men coming toward him. Harris pulled a shiny, silver-colored pistol from his waistband and said to McDowell, ''You fixin' to close up? Go to the cash box and hand over the money. Don't try nothing.'' McDowell removed the money from the cash box, about $140, and handed it to Edwards.

Harris then asked McDowell if he knew the combination to the safe and was told ''no.'' Harris then told McDowell to lift up a tray that fitted into the cash box which McDowell did; underneath were two quarters and a dime which Harris took.

Harris then asked McDowell to go with him to the alley behind the service station, which McDowell refused to do; when told to go inside the service station building, he did so. Harris wore a light-colored three-quarter-length coat and dark trousers; Edwards, a dark gray sweater and dark-colored trousers.

Harris and Edwards then left, going south on 43d Street, and McDowell called the police.

The next street west of 43d Street that intersects National on its south side is 40th Street. The next street that intersects 43d Street on its west side south of National is Newton, which, however, ends a short distance west of 43d without reaching another street; a short distance west of that end of Newton is a flood control channel, which was dry at that time, that runs in a southwesterly direction, with its course interrupted by 40th Street, until it ends a short distance south of Z Street, a street that runs east from 38th Street, which is the

second street west of 40th Street intersecting National on its south side. Thirty-ninth Street is a blind street that ends south of Newton, which is the street next southerly from National, running east from 38th Street, but broken at a point west of the flood control channel. Z Street is one block long, forms a "U" by turning north and running back to 38th Street in what is known as the north alley of Z Street. Running easterly from 38th Street are Newton, the first, and Boston, the second street south of National, with Z Street next south of Boston. Both Newton and Boston end at 40th Street, but from the east side of 40th Street a dirt road forms a "U" with its western ends opposite Newton and Boston.

Police in patrol cars in the area were alerted with news of the robbery and some description of the robbers at about 12:10 a.m. of February 3. Officer Rossen, on the west side of 40th Street between Newton and Boston, saw two males running across a street; one of them ran up a bank onto Z Street. Rossen gave chase and when he reached Z Street, the man ran between some cars that were between two houses, where Rossen lost sight of him.

A search by a number of police officers on foot commenced at about 1:15 a.m. of February 3 of the area between National and Z Street west of 40th Street. Officer Thurston, working west from 40th Street on Boston, accompanied by Officer Huerta, saw Harris lying underneath a station wagon in a carport alongside a house at 3891 Boston. After calling Harris out from his recumbent position, Thurston advised him in the terms required by *Miranda* v. *Arizona* and then asked Harris what he was doing there. Harris stated (as testified by Thurston): ". . . that he was coming in from a Shirley King's house at 5034 LaPaz Street, that he had been walking, he had observed, as he put it, a dude that he knew and he knew this man was going his way so he accepted a ride with him.

"When he got into the area he stated he saw all the cop cars and that he did not want to go to jail for suspicion so he hid under the car."

Harris did not wear a three-quarter-length coat when discovered under the car.

At about 12:25, Thurston had stopped a car driven by one Wilburt Ross at 39th and Logan and had interrogated him as a possible driver of a get-away car.

As a part of his interrogation of Harris, he asked Harris if he knew Wilburt Ross. Harris said, in the words of Thurston, that: ". . . he did know a Wilburt Ross. First stated that he

hadn't seen him for approximately two months, then later stated that Ross lives up by his girl friend's house and that he had been riding around with Ross between 11:30 and 12 that evening.''

On February 3, George Alfredo Collins found a chrome-plated revolver underneath a washing machine in the back yard of his father's home at 3891 Boston and told his father about it; on February 3, the father brought the revolver, loaded with four cartridges, to Joseph Marino, a San Diego police officer. Collins had wrapped the weapon in a piece of toweling and no identifiable fingerprints could be recognized from it.

In the early morning hours of February 3, Officer Crandall, in a police car, was in the north alley of Z Street when he saw a man run up the alley and go between some buildings. Crandall got out of the car and tried to find the man, but failed to do so; he then walked easterly along the alley and saw another officer, Officer Rose, near a car just east of 3836 Z Street. As he approached Rose, Crandall saw that Rose had his pistol drawn and pointed at Edwards, who was on the ground coming out from underneath the car. There was money lying on Edwards' clothing and on the ground next to him. Crandall placed Edwards under arrest and took possession of the money, amounting to $151.63, of which $128 was in notes of the denominations of $1, $5 and $10.

About 10 minutes later, Crandall arrested a second male Negro in the neighborhood as a suspect in the robbery; that man was later released.

The places where Edwards and Harris were found were both in the block east of 38th Street.

Crandall searched Edwards and found two marijuana cigarettes in his pocket.

It was brought out on cross-examination of McDowell that he first identified the photographs of Harris and Edwards from among two books of photographs shown him by police at the service station on the night of the robbery; and that later that day McDowell had identified the two men from among six in a police lineup.

The photographs shown to McDowell at the service station were not produced at the trial.

A photograph of the men in the police lineup shows six male Negroes whose appearances presented no great disparity in age, physical characteristics or dress, with the exception that one of them had on a light-colored three-quarter-length

coat and that the tallest of the six men was perhaps 6 inches taller than the shortest of them. Neither Harris nor Edwards wore such a coat in the lineup.

### EVIDENCE ON BEHALF OF DEFENDANTS

Edwards testified that he did not have anything to do with the robbery; that on the night of the robbery he had gone at about 10 p.m. to a house in the area in which the police later made their search and had remained there playing in a crap game until one of the players, of whom there were about a dozen, started out for a liquor store and returned to say there were police in numbers in the area. Thereupon the game broke up and Edwards started off running. It was then between 12 and 1 a.m. He had won nearly all of the money he was found with in the game. He was able to name only two of the persons in the game, Courtney and Sinegal; he did not know in whose house he was playing or the address more nearly than that it was at 40th and Boston. He had been running before getting under the car and was arrested five or ten minutes after leaving the house where he had been playing. He did not know there was marijuana or tuinal in the clothes he was wearing when arrested and did not know how those things had gotten there; his stepbrother and brothers sometimes wore his clothing.

Sinegal, who had known Edwards for 10 years, testified that he went to the crap game with Courtney at about 11 p.m. and left when the game broke up. He saw Edwards at the game, did not see him leave and was not able to say if Edwards was still there when the game ended. Having testified that he had played in the game and won, Sinegal refused to say who besides Edwards and Courtney were there or at whose house it was conducted.

Courtney's testimony as to Edwards' presence at the crap game duplicated that of Sinegal, but Courtney said Edwards was present when the game broke up.

Harris testified that he started out to the home of one Shirley King at about 6:30 or 7 p.m. on February 2, where he remained until 11:30 or 12, when he walked to Euclid and Logan to hitch a ride. After waiting there for 15 to 30 minutes, he was given a ride to 40th and Boston, where he was let out and walked to the house of an aunt who lived in the third house from the corner on Boston. Finding the house in darkness, he continued to walk up Boston when he saw a police car. Harris was then beside the house at 3891 Boston and took

a position between the house and the car parked alongside. Harris admitted he had told Thurston he had not seen Wilburt Ross for two months; denied he had told Thurston he had been with Ross from 11:30 to 12 that night.

Neither Harris nor Edwards testified on the subject of the police lineup, nor on the subject of a waiver of a right to counsel at the lineup.

### CONTENTIONS ON APPEAL

The contentions on appeal are stated as follows:

"1. Was the police confrontation of the defendants for identification purposes so suggestive and conducive to irreparable mistaken identity as to deny them due process of law?

"2. Did defendants intelligently waive their right to counsel guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States at the lineup?"

The question as to waiver of the right to counsel has to do with the right to counsel at the time of the police lineup, when neither Harris nor Edwards was represented by counsel.

On the morning of the day on which the trial commenced, both Harris and Edwards were permitted by the court to move, under section 995, Penal Code, for a dismissal based upon a claim that McDowell's identification of defendants made at the preliminary hearing was the product of a lineup identification in which defendants participated without the assistance of counsel.

After reading the transcript of the testimony at the preliminary hearing, the court denied the motion. In doing so he found expressly that there was an effective waiver of the right to counsel at the lineup and that there was nothing unfair in the manner and method in which the lineup was conducted.

At the trial, after some cross-examination of McDowell by both defense counsel, a hearing was had out of the presence of the jury, in which both defense counsel cross-examined McDowell further as to his identification of defendants from photographs shown him by the police on the night of the robbery and in the lineup at the police station. It was only in that hearing that mention was made of identification from photographs or in the lineup.

After the cross-examination was completed, counsel joined in a motion to exclude the identification testimony of McDowell, which motion was denied. In denying it the court said: "I have read the transcript of the preliminary hearing carefully. I have watched and observed Mr. McDowell today and lis-

tened to a very astute cross-examination by Mr. Briggs. I am convinced that Mr. McDowell is telling the truth, that his identification was based primarily on at-the-scene robbery identification. He had an opportunity to look at these men. He looked at the pictures and he said he couldn't quite be sure from the pictures, they went to the line-up—and I looked at the pictures of the line-up, which looks to me to be a very representative and very fair lineup—and he testified, 'I identified them before the sweater was put on.' I am convinced that the identification is not tainted by anything that the police officer did, that Mr. McDowell had an opportunity and did observe and did identify these two defendants at the scene, at the place of business where the robbery allegedly took place.''

The reference to the sweater had to do with the fact that Edwards, when he went to the lineup, had left his sweater in the cell. McDowell thought Edwards was one of the men, but said he would be more certain if he saw Edwards in a sweater.[1] The sweater was brought and Edwards put it on. McDowell was then satisfied as to the identity.

An attempt was made to have McDowell say he had been shown more photographs at the police station before viewing the lineup; and to say that the police had told him at that time that the two robbers were in the lineup. We are satisfied with the trial judge's estimate that the evidence claimed to show those matters amounted to this: McDowell in saying he saw photographs before the lineup referred to having been shown photographs at the service station during the night; that what he testified the police told him was that there were two men in the lineup who might be the robbers, but that only McDowell could say.

With the exception of having Edwards put on his sweater after the tentative identification, all the men in the lineup were requested to do and did the same things.

McDowell was not dead certain that the photographs of Edwards and Harris were of the men who had robbed him. As mentioned by the trial judge, there is no way of our determining if those photographs were of recent origin or whether they were good likenesses of defendants as they appeared in February 1968.

So far as the use of photographs was concerned, the necessity of such use in the stages of the preliminary investigation

---

[1]McDowell's language was this: ''I identified him before he put the sweater on. I mentioned about a sweater.'' (Reporter's transcript, page 114, lines 20-21.)

of crime is recognized in *Simmons* v. *United States*, 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967], where the court said, at page 971 [390 U.S. at p. 384, 19 L.Ed.2d at p. 1253] : "[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

No such result of the use of photographs is to be found in McDowell's identification.

There were some inconsistencies in McDowell's testimony concerning the appearance and dress of the defendants; he testified that during the robbery Edwards wore a pull-over sweater. When arrested Edwards wore a cardigan. Harris wore sandals; McDowell said Harris wore ordinary shoes during the robbery.

The transcript of the preliminary examination is a part of the record on appeal. We have studied the testimony of McDowell given at that hearing and at the trial. On one subject he was fixed and definite on both occasions: he saw the defendants together on the service station property and nearby from about 10 p.m. or earlier until the robbery at about 12 midnight.

After considering all McDowell's alleged deficiencies in observation, memory and descriptive powers, there remains a firm conviction that he did independently remember and recognize the two men who had robbed him.

*Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], declares that the admission of evidence presented by the prosecution of a witness' pretrial identification obtained in violation of a defendant's right to counsel or due process is *per se* error not capable of being corrected by evidence showing an in-court identification by the witness was independent of the one unfairly obtained. (Cf. *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].)

Since no attempt was made here to use evidence of McDowell's pretrial identifications to strengthen his in-court identification, the question is whether the latter was in fact the unreliable product of the pretrial identifications. The trial court passed upon that question and the evidence to support its determination is substantial, clear and convincing, as is the evidence to support its determination that the police lineup was fairly conducted.

## WAIVER OF RIGHT TO COUNSEL AT POLICE IDENTIFICATION LINEUP

The question whether defendants intelligently waived their right to counsel at the lineup was brought up at the preliminary hearing. In that hearing it was only on cross-examination of McDowell that he mentioned the lineup. Thereafter the testimony of two police officers was presented by the prosecution as to the manner in which the lineup was arranged and as to the contact one of them had had with McDowell in bringing him to view the lineup.

Morebello, one of the officers, informed defendants of their right to counsel at a lineup and that if they wanted but were unable to retain counsel for that purpose counsel would be appointed for them. When asked what would happen if they did not wish to appear in a lineup, Morebello told defendants they would be lined up with other persons without any prospective witness being present; a photograph would be taken and would be shown to a witness.

Both defendants then said they were willing to appear in a lineup.

Counsel for Edwards in oral argument presents the claim that Edwards could not be said to have waived his right to counsel at the lineup because he had told Officer Smith he wanted to consult an attorney before making a statement, citing *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].

At 10 a.m., McDowell was at the police station for the lineup; at 12:20 p.m. of the same day, Officer Smith had the interview with Edwards in which the latter said he did not wish to make a statement without benefit of counsel.

There seems thus to be on the face of it a willingness to appear in a lineup without counsel after having been informed of the right to counsel. It is much as if a suspect, after having been fully advised of his rights to counsel during an interrogation, should say in answer to a question whether he would make a statement, "I'll talk."

"[T]he attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof." (*People* v. *Johnson,* 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865].)

The court's finding of a waiver finds support in the testimony.

Moreover, since the prosecution did not offer evidence of the identification lineup, the absence of counsel is only an element to be considered in passing on the question whether the holding of the lineup unfairly influenced the in-court identication. The finding of the court to the contrary has substantial support.

The judgments are affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 11, 1969.