[Crim. No. 3654. Fourth Dist., Div. Two. Mar. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MATHEW "D" THOMAS, Defendant and Appellant.

**COUNSEL**

J. Stanley Sanders for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Arnold W. Lieman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KAUFMAN, J.**—In a jury trial, defendant was convicted of two counts of rape (Pen. Code, § 261, subd. 3). His motion for a new trial and application for probation were denied, and he was sentenced to state prison for the term prescribed by law, the sentences to run concurrently. He appeals from the judgment of conviction.

Defendant contends (1) that the evidence is insufficient to support the verdict; (2) that he was denied the right to counsel at the police lineups; and (3) that the lineup procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was thereby denied due process of law.

### Sufficiency of the Evidence

■ The test on appeal, as to the sufficiency of the evidence, is whether there is any substantial evidence to support the conclusion of the trier of fact, not whether guilt is established beyond a reasonable doubt, and, in applying this test, we must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Redmond*, 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

Applying the above rule, the following is a statement of the evidence presented at trial.

■ At about 8:30 a.m. on June 16, 1968, the victims, two 18-year-old girls, Christie and her cousin Jayme, arrived at the Tahquitz Falls area in Palm Springs. The girls drove there in Christie's car and parked it at the foot of the trail leading to the falls. Christie was wearing a short dress with a two-piece bathing suit underneath. Jayme was wearing a two-piece bathing suit with a blouse over it. Both girls were carrying their sandals.

As the girls sat on the curb, putting on their sandals, three Negro men in an old light-colored car drove by, two men seated in the front seat, one in the rear. The man in the back was wearing a green turban. A man identified as defendant was sitting on the passenger side of the front seat. He was wearing a blue and white checked shirt with short sleeves and a straw hat. After the girls had put on their sandals, they started toward the falls area.

About 15 minutes after the girls started their walk, Jayme saw the defendant coming up behind her and said hello to him. Hearing her cousin's

greeting, Christie turned around to see to whom Jayme was speaking and saw the defendant. He had on a blue and white check shirt and a straw hat.

Defendant engaged the girls in conversation as they walked, asking Jayme if she would accompany him to a "love-in" which was being held in the falls area. When Jayme declined, and resisted defendant's attempts to put his arm around her, defendant produced a gun. Christie was ordered to walk ahead and to refrain from looking back, while Jayme followed, defendant holding his gun on her.

After walking about two minutes, Christie turned around and saw another male Negro. He was "about six-two," very thin, and about 20 years old. He had a green turban on his head and was wearing very bright colors. Christie testified that he was the same person whom she had earlier seen in the back seat of the car.

Defendant directed the girls behind some rocks. The other male Negro joined the trio behind the rocks. Defendant said that he was "high," mentioned marijuana, and asked the girls if they would like to smoke marijuana. They declined.

Defendant next ordered the girls to "disrobe." When the girls remained motionless, he repeated his request for them to disrobe. Jayme started to "turn back and look," and he told her not to. She asked him, "please not to do that." He told her to shut up; that if she would not cooperate, he would kill her. Jayme told defendant she did not care if he killed her but that she was not going to do anything with him. Defendant hit Jayme against the right ear with his gun and she fell down against the cement. Blood began to ooze out of her ear.

Defendant again ordered the girls to disrobe. When Christie stated she would not, defendant ripped off the top of her bathing suit.

Defendant helped Jayme off with her bathing suit top. He told the girls to lie down on their stomachs, facing the rocks. After the girls were undressed, defendant said, "I'm taking this one," pointing at Jayme.

It is unnecessary to recount the details of the rapes. Suffice it to say that the victims testified in detail that the defendant compelled Jayme to have three acts of intercourse with him and compelled Christie to have intercourse with him.

During the course of the attacks upon the girls, defendant got up and asked Christie if she had a cigarette. She told him she had. He got a cigarette out of his pocket and asked her if she had any matches. Christie gave him a book of matches, blue and white in color, having the name "Newporter Inn" on the cover. The matches were not returned to Christie.

Following the attacks, defendant ordered the girls to keep silent regarding the events of the morning, threatening to kill them should they disobey. He told the girls to count to 100 and left. After counting, the girls got dressed, walked over to a stream and washed and left the area. After attempting to locate a hospital without success, the girls went to the police station in Palm Springs. It was then approximately 10 a.m.

At approximately 10:35 a.m. Christie and Jayme were admitted to the Desert Hospital for examinations. Traces of spermatozoa were found on the vaginal walls of both Christie and Jayme. The examining physician examined Jayme's right ear and observed an irregular laceration involving the cartilage and skin of the ear which was repaired with stitches.

At approximately 9:55 a.m. Officer Gary Boswell of the Palm Springs Police Department noticed an older model, grey Cadillac stopped in a no-parking zone near the base of the path to Tahquitz Falls. Initially, the car appeared to be empty. However, as he approached for the purpose of issuing a citation the officer saw a man, who had evidently been lying on the rear seat, sit up. Upon questioning, this man, a Negro, gave his name as Jimmy Lee Patrick. He stated that he had but recently arrived in the Palm Springs area, where he had been met by his cousin and the owner of the car, a friend of his cousin. Mr. Patrick indicated that he did not know the owner's full name, referring to the person only as "Matthew." Officer Boswell remained outside the automobile and Mr. Patrick assisted the officer in his attempts to ascertain the owner of the vehicle by handing to the officer the contents of the glove compartment. Although the registration slip could not be located, Officer Boswell found among said papers a number of forms, bills and receipts made out to Mathew Thomas. This automobile was identified as the same one the girls had seen earlier and was owned by defendant's wife. Defendant, by his own testimony, had the use of this automobile on the date of the crime.

At the time of his arrest, defendant explained the presence of this automobile at the entrance to Tahquitz Falls by telling the arresting officer that the automobile had been stolen on the evening of June 15, 1968, and not recovered by him until sometime before noon the next day when he found it near the entrance to Tahquitz Falls. No report to the police of this alleged theft had been made. At the trial, however, defendant testified that he had driven the car to Banning on the evening of June 15, 1968, for the purpose of attending a party and had not returned to his home with the car until early on the morning of June 16, 1968, at which time he parked the car near his home, leaving the key in the vehicle. He stated that he then went to bed, where he stayed until approximately 3 p.m. on June 16.

Detective Howard Tuthill of the Palm Springs Police Department placed

defendant under arrest about 200 feet from the defendant's home at approximately 9 p.m., June 16, 1968. Officer Tuthill told defendant that he was under arrest for investigation of forcible rape and advised him of his constitutional rights in conformity with *Miranda.* Officer Tuthill asked defendant if he understood these rights; defendant said he was not sure. The officer readvised him of his rights and defendant then stated he understood.

Officer Tuthill next sought, and was given permission, to enter defendant's house for the purpose of conducting a search.[1] On the floor of the northeast bedroom, the officer found a book of matches, white with blue lettering, bearing the name "Newporter Inn." Defendant stated to Officer Tuthill that these matches were his.

The defendant was identified as the assailant, both at police lineups and in court by the two victims of the crime. A matchbook similar to that given the assailant by Christie was found in defendant's home and ownership thereof was claimed by defendant. The automobile registered to defendant's wife, to which he had access on the date of the crime, was established as being at the scene of the crime within a few minutes of its commission. Obviously, the verdict is supported by substantial evidence.

Before considering defendant's contentions concerning the unlawful character of the police lineups, it should be noted that respondent argues that defendant is precluded from raising these issues on appeal because of his failure at trial properly to object to or move to strike either the evidence of the lineup identifications or the in-court identifications.[2] There is considerable merit in respondent's position. (See *People* v. *Harris,* 274 Cal. App.2d 826, 832 [79 Cal.Rptr. 352]; *People* v. *Armstrong,* 268 Cal.App.2d 324, 326 [74 Cal.Rptr. 37]; and *People* v. *Rodriguez,* 266 Cal.App.2d 766, 769-770 [72 Cal.Rptr. 310].) Nevertheless, defendant did adduce at the trial considerable testimony concerning the absence of counsel at the lineup and some testimony concerning the circumstances of the lineup which was

---

[1]Out of the presence of the jury, the court found that the search was with defendant's consent and that it was reasonable.

[2]In its direct examination, the prosecution did not offer any evidence that Christie, its first witness, had identified defendant at a lineup. The facts concerning the lineup identifications were first adduced by defendant's attorney on cross-examination of Christie. Thereafter, when Jayme was called by the prosecution as a witness, she did testify on direct examination about the lineup identification. The only objection made by defendant to any eyewitness identification testimony was an objection to the question posed to Christie by the prosecutor, "Do you see that person [referring to previous testimony] here in the courtroom today?" The objection was on the ground that the question was leading and suggestive and was overruled.

probably intended to raise these issues, and we are inclined to consider these contentions on their merits.

### Right to Counsel

■ It is established that a suspect in a criminal case has a constitutional right to representation by counsel at a police lineup. (*United States* v. *Wade,* 388 U.S. 218, 236-237 [18 L.Ed.2d 1149, 1162-1163, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951.) This rule applies to lineups held prior to the filing of an information or indictment (*People* v. *Fowler,* 1 Cal.3d 335, 342-344 [82 Cal.Rptr. 363, 461 P.2d 643]), and it applies to all lineups held after June 12, 1967 (*People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]). ■ If a lineup is held in violation of a defendant's right to counsel, in the absence of an intelligent waiver of said right, it is error to introduce any evidence of the lineup identification, and the question then becomes whether beyond a reasonable doubt the evidence of the lineup identification did not contribute to the verdict. (*People* v. *Fowler, supra,* 1 Cal.3d 335, 350; *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

It is undisputed that the two police lineups in this case took place within a few minutes of each other on June 16, 1968, and that defendant was not represented by counsel. The question is whether defendant intelligently waived representation by counsel at the lineups. (*United States* v. *Wade, supra,* 388 U.S. 218, 237 [18 L.Ed.2d 1149, 1163, 87 S.Ct. 1926].)

The testimony relevant to this issue may be summarized as follows. Officer Tuthill testified that, prior to the lineups, he explained to defendant the charges against him; that the police wanted to hold a lineup; that he informed defendant he was entitled to be represented at the lineup by an attorney; that he did not have to participate in a lineup without an attorney; and that if he did not have sufficient means to employ an attorney the court would appoint an attorney to represent him without cost to him. He further testified that, at first, defendant stated he did not think he needed an attorney for the lineup, but that he (Officer Tuthill) several times emphasized the gravity of the charges against defendant and suggested that defendant obtain the services of an attorney. Officer Tuthill stated that defendant looked through the phone directory and placed several calls but was unsuccessful in contacting an attorney. At this juncture, Officer Tuthill asked defendant whether he would like to go through the lineup without an attorney or wait, to which defendant replied that he would go through it. The officer testified that he specifically asked defendant whether he waived his right to counsel and defendant replied that he did.

In his testimony, defendant verified that Officer Tuthill informed him that he did not have to go before a lineup without an attorney unless he wanted to; that an attorney would be provided for him if he wanted; that Officer Tuthill told him, ". . . you're in real trouble, you'll need an attorney"; and that the officer handed him the phone directory and assisted him in placing at least one call. Defendant testified that he did reach the secretary or answering service of one attorney and discussed the matter with the person who answered the phone. Defendant further testified, however, that he told Officer Tuthill that he did not want to appear in the lineup without an attorney, but that the officer told him, "It's not really necessary for these, whether he's here or not." According to defendant, another officer present at that time told defendant ". . . it was just throwing away my money." Defendant denied that he expressly waived the right to counsel and testified he went through the lineup without an attorney against his will. He also testified that he had funds but did not know whether he had sufficient funds to obtain the services of an attorney.

As a result of defendant's failure to object to or move to strike the evidence of the lineup identifications on the ground that he was deprived of the right to counsel at the lineups, the judge was not presented at trial with an opportunity to make an express determination on defendant's waiver of counsel. (See Cal. Evid. Code, § 405.) It is clear from the record, however, that the trial court determined that defendant did intelligently waive his right to counsel at the lineup, for the trial judge denied defendant's motion for a new trial at which time defendant cited to the court the applicable authorities and argued this contention at length.

Furthermore, it is uncontroverted that defendant was informed by Officer Tuthill of his right to counsel at the lineup; that he did not have to go through the lineup without counsel unless he wanted to; that an attorney would be provided him if he so desired; and that the officer was solicitous with respect to defendant's rights. In view of this testimony by defendant, the argument that he participated in the lineups against his will is completely untenable and we conclude that defendant intelligently waived his right to counsel at the lineups.

### Unnecessarily Suggestive Lineup

If a defendant's identification as the perpetrator of a crime is derived from a lineup that, under all of the circumstances of the case, was so unnecessarily suggestive as to be conducive to irreparable mistaken identification, the admission into evidence of the lineup identification or the derived in-court identification constitutes a denial of due process of law. (*Stovall* v. *Denno*, 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967];

*People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].)

To invoke the exclusionary rule, however, the defendant must demonstrate that the lineup procedure "resulted in such unfairness that it infringed his right to due process of law" (*People* v. *Caruso, supra,* 68 Cal.2d 183, 184; *Stovall* v. *Denno, supra,* 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1205, 87 S.Ct. 1967, 1971]), and a judgment of conviction will be reversed on this basis only if the lineup procedure was so unnecessarily suggestive that it gave rise to a very substantial likelihood of irreparable misidentification (*Simmons* v. *United States,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967, 971]). Such a claim by a defendant must be evaluated in light of the totality of the surrounding circumstances. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972]; *Simmons* v. *United States, supra,* 390 U.S. 377.)

The facts concerning the circumstances of the lineups are sparse but undisputed. There were two lineups. They took place at the Palm Springs police station between 11 p.m. and midnight on the night of June 16, 1968, the date of the crime. The subjects in both lineups were the same, being five in number, including defendant. They were all Negroes. Each of the subjects in the lineups was asked to say certain words used by the assailant earlier that day, such as "love-in," "let's get high, baby," "sex," "disrobe," "straight ahead baby," and "freeze." Each subject spoke the same words. At each lineup defendant was dressed in blue denim long trousers and a blue denim short-sleeve shirt, ragged around the sleeves,[3] and defendant was barefooted. Two of the other subjects were more neatly dressed in white and black trousers with a cummerbund around the waist. The other two subjects were dressed in dirty street clothing. No one other than defendant was barefooted. Present at each lineup were Christie, Jayme, Officer Tuthill, who conducted the lineups, and another police officer identified as "Nick."

The first lineup took about 10 minutes. There was no conversation between the two girls or between either of the girls and the police officers during the first lineup. At the conclusion of the first lineup, in the presence of Jayme, Christie unequivocally identified the defendant to Officer Tuthill as one of the assailants. Jayme did not then identify defendant but stated that another man in the lineup resembled the assailant who had worn the green turban. Christie was not able to identify the person referred to by Jayme as the other assailant.

The second lineup was held within a few minutes of the first at the request

---

[3]Defendant testified that upon his arrival at the police station he changed clothes. Presumably, this blue denim clothing was supplied to him by the police, but there is nothing in the record to indicate that the victims knew that this clothing was supplied by the police.

of Jayme who wanted to see the subjects again and to hear them speak more. Between the first and second lineups Christie and Jayme had no conversation with each other except that Jayme repeated that the person she pointed out looked like the assailant who had worn the green turban, and Jayme had no conversation with the police officers except that she told them substantially the same thing. After viewing the subjects and listening to them speak the second time, Jayme then positively identified defendant as one of the assailants. There is no evidence that there was any conversation between Christie and Jayme or between either of the girls and either of the officers during the second lineup.

Earlier in the day, Christie had described the assailant who had the gun as being about 5 feet 11 inches or 6 feet tall and weighing about 175 to 180 pounds. She had reported to the police that he did not talk "like a southern negro, or the way most negroes talk" and that he had a speech defect which she described as a lisp. She told her grandparents earlier that day that he had gold teeth.

Defendant testified that he was 5 feet 11 inches tall and weighed 198 pounds.

Christie testified that she identified defendant at the lineup upon the basis that he looked like the assailant, that he fit the description she had given to the police and on the basis of his speech. She testified that defendant did not speak like a southern Negro or with the dialect common to many Negroes and that he had a lisp. He "talks exactly like the person that it was."

Earlier that day Jayme had described the assailant with the gun as being tall (6 feet to 6 feet 3 inches) and had reported to the police that he had a deep voice and spoke without the dialect characteristic of some Negroes.

Jayme testified that she identified defendant at the lineup on the basis of his height and build, the gold caps on his teeth and on the basis of his speech.[4]

Defendant urges that the fact that he was barefooted and dressed in the blue denim clothing described above, while the others in the lineups were not similarly dressed, unnecessarily suggested his identification and he asks us to conclude from the fact that Jayme did not identify him at the first lineup, but only at the second lineup after the positive identification by

---

[4]Witnesses were excluded at the trial and Christie and Jayme did not hear each other's testimony.

Christie of defendant in the presence of Jayme, that defendant's identification must have been unnecessarily suggested.

■ While we do not approve of the practices of having one of the subjects in the lineup dressed substantially different from the others or having one witness make an identification in the presence of another witness, it would be sheer speculation to conclude that either of these circumstances made these lineups so unnecessaily suggestive as to result in a very substantial likelihood of irreparable misidentification (*Simmons* v. *United States, supra,* 390 U.S. 377), and to sustain his claim of a violation of due process, defendant must show that his trial resulted in essential unfairness "not as a matter of speculation but as a demonstrable reality." (*Adams* v. *United States* ex rel. *McCann,* 317 U.S. 269, 281 [87 L.Ed. 268, 276, 63 S.Ct. 236, 242]; *People* v. *Patton,* 264 Cal.App.2d 637, 642 [70 Cal.Rptr. 484].)

There is not one word in the testimony nor anything in the record tending to show that the identification of defendant at the lineups had anything whatsoever to do with his being dressed as he was or the fact that he was barefooted. The assailant was not dressed in this fashion, nor was he barefooted. The witnesses testified specifically as to the bases upon which they identified defendant at the lineup as hereinabove set forth and did not mention the manner in which he was dressed. There is no evidence to indicate that the witnesses were told anything about the progress of the police investigation or that the police in any way suggested which person in the lineup was under suspicion, and there is no evidence that Christie attempted in any way to influence Jayme with respect to the identification. In fact, the testimony was that there was no conversation between Christie and Jayme during the first lineup and that after the first lineup the only conversation they had was Jayme's statement that one of the other subjects resembled the other assailant. On these facts, Jayme's failure to identify the defendant at the first lineup constitutes significant evidence that the lineup procedure was not unnecessarily suggestive, for, if it had been, Jayme would likely have identified defendant immediately at the first lineup.

Moreover, there is in the circumstances of this case little chance that the lineup procedure led to misidentification of defendant. The crime took place in broad daylight. Both victims were in the presence of the assailant for approximately an hour and had ample opportunity to see him. The lineups were held 14 hours after the attack, while the recollection of the victims was presumably fresh. (See *Simmons* v. *United States, supra,* 390 U.S. 377, 385 [19 L.Ed.2d 1247, 1253].) In addition, there is very strong circumstantial evidence that defendant was the assailant. Inexplicably, the automobile of which he admittedly had use, was seen by the police and the

victims at the scene of the crime shortly before and shortly after its commission, and the book of matches given the assailant by Christie was found in his possession. Taken together, these circumstances leave little room for doubt that the identification 'of defendant was correct, even .though the lineup procedure employed may have in some respects fallen short of the ideal. We conclude that defendant has not demonstrated that the lineup procedures gave rise to a very substantial likelihood of irreparable misidentification so as to result in such unfairness that it infringed his right to due process of law.

Although not raised in the briefs, at oral argument counsel for both parties brought to our attention a ruling by the trial court upon the admissibility of certain proffered evidence, which merits our consideration.

■ In cross-examining Christie, counsel for defendant asked, "How was Mr. Thomas dressed when you identified him?" The prosecutor objected on the grounds that the answer sought was immaterial and irrelevant, and the court sustained the objection. Out of the presence of the jury, counsel for defendant then stated to the court, "I believe our evidence will ,show, Your Honor, that everyone else in that lineup was dressed in neat clothing and that Mr. Thomas was the only one who was barefoot at the time, and in tattered clothes provided by the police department. I think this goes to the weight and quality of the identification." The court again sustained the objection.

Obviously, this ruling was erroneous. Even before the announcement of the rule in *Stovall* v. *Denno, supra,* 388 U.S. 293, the manner in which the lineup was conducted was admissible for the purpose of attacking the weight and quality of the identification. (*People* v. *Parham,* 60 Cal.2d 378, 380 [33 Cal.Rptr. 497, 384 P.2d 1001]; Cal. Evid. Code, § 406.)

We have concluded, however, that this erroneous ruling did not constitute reversible error, whether tested by article VI, section 13 of the California Constitution, or the rule of *Chapman* v. *California,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. There is no reasonable probability that the exclusion of this evidence affected the result in the case and it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict. In the first place, as previously noted, there is absolutely no indication from the testimony or the record that the identification by Christie or Jayme had anything whatever to do with the manner in which defendant was dressed at the lineups. In the second place, later in the trial, defendant was permitted to testify in detail as to how he was dressed at the time of the lineups and that he was bare-

footed, which the prosecution made no attempt to controvert, and these facts were argued to the jury by defendant's counsel.

Judgment affirmed.

Kerrigan, Acting P. J., and Tamura, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1970.