[Crim. No. 18219. Second Dist., Div. Two. Oct. 15, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES HOWARD COLLINS, Defendant and Appellant.

## Counsel

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Donald J. Oeser, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**FLEMING, J.**—James Howard Collins appeals his conviction by a jury of second degree robbery. (Pen. Code, § 211.)

*The Robbery*

Mrs. Juanita Chambers and her daughter Delenna Sue Chambers were tending their small grocery store in Long Beach at 7:30 p.m. on 15 April

1969. Collins entered the store, walked to the meat counter and asked Mrs. Chambers for a pickled pig's foot. Mrs. Chambers noticed Collins as he approached the meat counter and remembered having seen him in the store at different times before. She picked out a pickled pig's foot, wrapped it, put on a second wrapper at Collins' request, collected payment, handed back change, and when Collins left the meat counter she picked up some bottles to carry into another room. Delenna Sue, age 17, was at the cash register, and she first saw Collins when he was five or six feet away at the meat counter buying the pickled pig's foot from Mrs. Chambers. She then noticed him walking to the beer counter. A few minutes later he came to Delenna Sue's counter, set a can of beer on it, and pointed a gun at her. He was about a foot away. She glanced at him for about two seconds, got "Not a real good look, but, you know, enough to know what he looked like," screamed, and ran to her mother who had just stepped through the door into the other room. Delenna Sue and her mother returned to the cash register a few seconds later, but Collins was gone and so was most of the $200 which had been in the cash register.

Collins admitted he had been in the store on prior occasions but claimed he was elsewhere at the time of the robbery.

Mildred Bailey, a friend of Collins' sister, testified that about 7, 8, or 9 p.m. on the night of the robbery she saw Collins walking fast in an alley near the Chambers' store and spoke to him.

*The Identifications*

Evidence at a pretrial hearing to suppress evidence brought out the foregoing facts and also revealed that immediately after the robbery Mrs. Chambers and Delenna Sue described the robber to the police as 5'6" tall and 140 pounds. Collins testified that he was 6'3" or 6'4" tall and 165 to 170 pounds. Mrs. Chambers explained the discrepancy by stating that she and Delenna Sue were standing on raised platforms behind the counters at the times they waited on Collins.

The day after the robbery Police Officer Lance showed Mrs. Chambers and Delenna Sue photographs of eight different suspects. Both women picked out a photograph of Collins. Two days later a different officer, Officer Lambert, showed Mrs. Chambers and Delenna Sue a different set of photographs containing a different photograph of Collins. Neither woman positively identified Collins' photograph from this set. Mrs. Chambers testified she had not understood the officer wanted her to again pick out a photograph but that she had had in mind the photograph of Collins, although it was a different, darker one. Delenna Sue testified she put

aside Collins' photograph, but was not really sure of it because "he was more dark complected" in this photograph.

Because Mrs. Chambers and Delenna Sue were unable to pick out a photograph from the set shown them by Officer Lambert, Collins, then in custody, was released. A week later, Officer Lance called on Mrs. Chambers and Delenna Sue to inquire about their identifications and showed them both sets of photographs. They affirmed their original identifications and explained that the second photograph of Collins had been too dark. Officer Lance then undertook to rearrest Collins.

Collins was not located for three months and was not rearrested until 3 a.m. on 24 July 1969. At 1 p.m. that day Mrs. Chambers and Delenna Sue identified him in a lineup. Although the lineup was otherwise fairly conducted, it was held without compliance with defendant's request for the presence of an attorney. At 12 noon Collins had asked to have an attorney present, but neither a private attorney nor the public defender were available at the scheduled time of the lineup. The lineup evidence was not used at the trial.

Mrs. Chambers and Delenna Sue identified Collins as the robber at the preliminary hearing, at the pretrial hearing to suppress evidence, and later at the trial itself.

Mrs. Chambers was asked: "Q. Now do you feel that you could identify the suspect at any time after the robbery occurred? A. Yes. Q. Irrespective of any photographs or lineups; is that right? A. Right."

Delenna Sue was asked: "Q. Is it a fact that when you look at Mr. Collins right now and identify him, you are identifying him in your mind, you feel three different things, that he is the man who robbed you, that he is the man whom you saw in the photos, and that he is also the man that was at the lineup; isn't that right? A. Yes."

The motion to suppress the evidence of the identifications was denied, and at the subsequent trial the jury found defendant guilty of second degree robbery.

*Should the Witness Identifications Have Been Suppressed?*

The sole issue of consequence is whether the witness identifications should have been suppressed.[1] Collins contends that the in-court identi-

---

[1]Collins' attack on the instruction on burden of proof was not properly raised at trial, and in any event has no merit. (*People* v. *Hughes,* 268 Cal.App.2d 796, 801 [74 Cal.Rptr. 107].) Collins' contentions that the prosecutor intentionally misled the jury and that defense counsel was ineffective are not supported by the record.

fications by Mrs. Chambers and Delenna Sue were tainted by an invalid lineup and should have been suppressed. He relies on the proposition that a suspect has the right to the assistance of counsel at a lineup (*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]), and he points out that his request for the presence of an attorney at the lineup was not honored.

The mixup with respect to the lineup came about because Officer Lance telephoned Mrs. Chambers and Delenna Sue to come to the station to view a lineup at 1 p.m. Another officer got in touch with defendant and told him a lineup was scheduled at that time and he was entitled to have an attorney present. Defendant requested an attorney, and at 12 o'clock Officer Lance called the public defender's office. He was told no one would be available until 2:30 that afternoon. He could not reach Mrs. Chambers and Delenna Sue to tell them not to come in, and the two arrived at the police station promptly at 12:30 p.m. At 12:45 Officer Lance again called the public defender's office and was again told no public defender was available. The lineup was held at 1 p.m. It thus appears the police gave priority to the convenience of the victims of the robbery rather than to the presence of counsel for the suspect at the lineup. This decision, although understandable, was erroneous in that the convenience of the victims should have been subordinated to the suspect's right to counsel at the lineup. Mrs. Chambers and Delenna Sue should have been told to wait until 2:30 p.m. or the lineup should have been rescheduled or cancelled.

We have here a classic instance of Cardozo's constable's blunder, and the issue is whether because of that blunder the criminal should go free. The evidence of the lineup itself was never used, and hence direct use of inadmissible evidence is not involved. Rather the question is whether the three subsequent courtroom identifications of Collins by Mrs. Chambers and by Delenna Sue were so tainted by the invalidity of the lineup that the entire identification testimony of the victims should be suppressed, and the prosecution abandoned.

■   We reject any suggestion that the absence of counsel from a lineup operates to give a defendant immunity from prosecution. We think Justice White overstated when he said in his dissent in *Wade:* "To all intents and purposes, courtroom identifications are barred if pretrial identifications have occurred without counsel being present." (388 U.S. at p. 251 [18 L.Ed.2d at p. 1171].) *Wade* and *Gilbert* require only that evidence of in-court identifications be excluded if the identifications are tainted by the improper lineup. In-court identifications are admissible if the prosecution

establishes that they are based on observations of the defendant other than those made at the improper lineup. (*People* v. *Hagen,* 6 Cal.App.3d 35, 46-47 [85 Cal.Rptr. 556].)

■ The trial court which heard the motion to suppress evidence found that the in-court identifications by Mrs. Chambers and Delenna Sue were not tainted by the lineup observation and denied the motion to suppress.[2] In our view the record supports this ruling. During the robbery both Mrs. Chambers and Delenna Sue looked directly at Collins from distances of a foot or so. Mrs. Chambers recognized him at the time as someone she had seen in the store on previous occasions. Delenna Sue glanced at him two or three seconds, long enough "to know what he looked like." Since the robbery both Mrs. Chambers and Delenna Sue have positively identified Collins on each occasion they have seen him. The day after the robbery both women identified Collins by photograph. Two days later both women saw another photograph of Collins and declined to identify it because the photograph was too dark. When subsequently shown both sets of photographs both women again identified Collins as the robber. At the preliminary hearing both witnesses identified Collins. At the pretrial hearing Mrs. Chambers said that she could identify Collins "Irrespective of any photographs or lineups." Delenna Sue said that she identified Collins in court because, besides being in the lineup and in photographs, he was the man who robbed her. At the trial identifications by both witnesses were positive, emphatic, and unshaken.

Since the record amply supports the trial court's finding that the in-court identifications were made independently of observations at the invalid lineup, the identifications were properly received in evidence, and the judgment is affirmed.

Herndon, J., concurred.

---

[2]The judge stated at one point: "I feel that the evidence before me is such that their identification is not dependent merely upon the lineup itself and should be permitted to go to the jury. . . ." The judge's other comments make clear that he intended this somewhat ambiguous statement to mean that he found the in-court identification to be untainted by the lineup within the meaning of *Wade* and *Gilbert.* He earlier stated: ". . . can we zero in on . . . whether or not despite the illegality of the lineup, the People have been able to show that the identification was unaffected by any selection of the defendant at the lineup. That is what I am concerned about." And then: "I query whether granting the establishment of the primary illegality of the lineup in this case from the evidence before me, to which objection has been made by this defendant, if it has come about by exploitation of that illegality or whether instead it has come about by means sufficiently distinguishable to be purged of the primary taint. . . ."

**ROTH, P. J.**—I dissent.

The question of identity is decisive of this appeal.

The issue is whether an in-court identification of appellant made by a victim of an armed robbery is free of or non-prejudicial in spite of the taint of an admittedly illegal lineup.

Mr. and Mrs. Chambers owned a small grocery store in Long Beach. At about 7:30 p.m. on April 15, 1969, shortly before closing, appellant approached Mrs. Chambers at the meat counter in the store and asked for a pickled pig's foot. Mrs. Chambers reached for the merchandise, wrapped the purchase and delivered it with some change to appellant. Mrs. Chambers immediately thereafter walked into a back room of the store as she was making arrangements to close for the day.

Within a minute or two after the foregoing purchase appellant approached Delenna Sue Chambers (Sue), daughter of the proprietors who worked in the store after school. Sue was standing at the cash register. Appellant pointed what looked like a "real gun" at her. Sue testified that she looked at appellant's face "Just enough to get a good look at him, about two, three seconds" before she screamed and ran to the back room where her mother was. The cash register was left open. When Sue and her mother returned to the register, "mostly all" of the $200 were missing, and appellant had left the store.

The Long Beach police were notified. Officer Tuntland testified he arrived with Officer Popov within one-half hour after the robbery. He interviewed Mrs. Chambers and Sue. Mrs. Chambers did not see the actual holdup. He was told by both "It was a male Negro, 28 to 30, height was 5′6 to 5′8, weight 140 pounds, black hair, wearing a black hat with a white band, gray shirt, white pants and black shoes." Appellant is 6′3, weighed 170 pounds and is 22-23 years of age. When selling the pickled pig's foot to appellant, Mrs. Chambers was standing on a platform two to three inches high. It should be noted, however, that at the trial Mrs. Chambers made a point of testifying, as the majority emphasize, that she "remembered having seen him in the store at different times before" although the record is clear that Mrs. Chambers did not mention that fact to either Officer Tuntland or Popov.

Mildred Bailey, who knew appellant through his sister, saw him in the vicinity of the Chambers' store at about 8 or 9 in the evening. Although Mildred could not recollect the day or month, she did testify that she saw

appellant on the evening the robbery was supposed to have happened, having heard about the crime on the following morning.

On April 16, 1969, less than 24 hours after the robbery, Officer Lance of the Long Beach police showed Sue eight photographs and asked her to look through them to "see if the person that had robbed her was among the pictures." Appellant's picture was approximately in the middle of the pile. Sue spread the photographs out and picked out appellant's as being that of the robber. Mrs. Chambers, too, was shown the pictures and, not having been informed of Sue's choice, chose appellant's as the one that "resembled" the person she assumed had robbed the store. She was not "absolutely positive" of her identification, in spite of her subsequent 'in-court' testimony that she "remembered having seen him in the store at different times before." In Officer Lance's words, she had some difficulty in making the identification.[1]

On April 18, 1969, after appellant had been arrested on the strength of the April 16 identification, Sergeant Lambert showed Mrs. Chambers some photographs, which included one of appellant taken after his arrest for the Chambers robbery. Again, Mrs. Chambers chose appellant's picture but she was unable to furnish a positive identification.

Sue did not identify any of the pictures as representing appellant; according to Sergeant Lambert, she made "no identification whatsoever."[2] Although appellant was in custody no lineup was arranged.

Within a few hours after the visit of Sergeant Lambert, appellant was released from custody because of the inability of both Mrs. Chambers and

---

[1] Officer Lance stated the above procedure took ". . . approximately 20 to 30 minutes . . . [and that he then] returned to the police department, filed a report indicating the identification made at that time. . . ."

The report referring to Sue said: "She stated that she did not feel that he had a mustache at this time, or, if he did, it was a very small mustache."

It should be noted, too, that although appellant was in custody within hours after the robbery, there is not a shred of evidence in respect of his possession of the stolen $200 or any part thereof.

[2] Lambert testified that one of the photographs which he had in his possession was taken of appellant on the previous day. He showed the photographs to Mrs. Chambers at the store and later the same day to Sue at Poly High School. He said that the photos were all of Negro men of about the same complexion and, in respect of Mrs. Chambers, he testified: "I showed her all the photos I had with me, the nine of them. At the time, she laid the defendant's photo aside, stated that it looked something like the man that had robbed her, but she couldn't be positive."

Lambert, describing Sue's reaction, testified: "I showed her the whole group at one time. Q. What did you tell her to do? A. To pick the photo of the man out that had robbed her at the little grocery store. Q. What did she do? A. She didn't pick any out. Q. Did not pick any out at all? A. No."

It should be noted, too, that Lambert testified on direct that when he went to interview the victims on the 18th, he did not know that prior photos had been shown

Sue to positively identify appellant as the robber. The efforts of the police were not discontinued, however. A few days after April 18, Officer Lance returned to the Chambers' and questioned them about the April 18 identification. Mrs. Chambers stated that ". . . the reason she made no identification in the second group of photographs was that the person who looked similar to the suspect was too dark in that photograph, therefore, she did not feel it was him" and Sue explained her failure to identify appellant by saying that the ". . . photograph in the second set of photographs had looked like, similar to the suspect whom she did not identify in the second group of photographs, was too dark."

In the evening of July 23, 1969, three months after the events described above, appellant was rearrested for the same robbery. A lineup was then scheduled for approximately 12:45 (noon) of the next day, July 24.

Appellant was advised of the lineup at approximately 12 noon on July 24, and concededly made unequivocal request for an attorney to be present during the lineup. Officer Lance then called the public defender's office, requesting an attorney. He was told none would be available until 2:30. Since the Chambers were on their way to the station, Lance advised appellant he could not call them to postpone their presence and the lineup would proceed. At 12:45, presumably after the arrival of Mrs. Chambers and her daughter, Lance called the public defender again, with no results; and shortly thereafter, the lineup not having been postponed, appellant was identified by both Mrs. Chambers and Sue. The Attorney General concedes that the lineup was illegal. (*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].)

A preliminary hearing was held thereafter at which Mrs. Chambers and Sue identified appellant.

On cross-examination at the preliminary examination, Sue Chambers testified in pertinent part: "Q. The first time you were shown photographs, did you select a particular photograph this first time? A. Yes. Q. And were you positive of your identification on this first instance? A. Well, no, not really. Q. You noticed there were some dissimilarities between the robber and this photograph? A. Yes, uh-huh. Q. You picked it out be-

to the victims, thus disclaiming any knowledge of a report presumably on file made by Officer Lance. On redirect examination, however, Officer Lance testified that the victims had earlier identified the suspect out of another group of photographs, presumably those shown to the victims by Lance, and that he went out for the purpose of showing the latest photograph of appellant which had been taken the previous day.

cause it resembled him most; is that correct? A. Yes. Q. Not because it actually depicted accurately the person you thought it was; is that correct? A. Yes.

"
.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Did seeing Mr. Collins at the lineup enhance your ability to identify him? A. Yes, just his profile and his—you know, his figure and stuff. You know, his build and everything. Q. *Would you have had no difficulty in identifying Mr. Collins as a robber, today, if you had not seen him at the lineup? A. I don't believe so. Q. You are not sure? A. I don't—no, I'm not sure."* (Italics added.)

It is clear from the undisputed evidence in the record that the *only person* who saw the robber at the time of the holdup was Sue, who testified she saw him for two or three seconds and then ran screaming from the cash register to the back room.

It was not until June 1970, that the Court of Appeal considered a purposeful deprivation of counsel at a lineup as a case of "first impression" in *People v. Keim,* 8 Cal.App.3d 776, 780 [87 Cal.Rptr. 597].[3] In *Keim,* the suspect requested counsel for the lineup. He called an attorney, and had been told that someone would be there to represent him. However, no one did arrive and the lineup was held without benefit of counsel since, as in the case at bench, the police refused to delay the proceedings. The trial judge in *Keim* ruled that the police could proceed when counsel failed to appear at the scheduled time and evidence of the lineup was then admitted. (8 Cal.App.3d at p. 779.)

In *Keim,* the court held that the lineup was in violation of the suspect's Sixth Amendment rights and it thus was "error of constitutional magnitude to admit evidence of the lineup itself." (8 Cal.App.3d at p. 781.) (*Gilbert v. California, supra,* 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186]; *People v. Thomas,* 5 Cal.App.3d 889, 896 [86 Cal.Rptr. 97].) At bench, evidence re the lineup was not admitted.[4]

---

[3] I disagree with the euphemism used by the majority that deprivation of counsel at the lineup was "Cardozo's constable's blunder." The police decision at bench to hold the lineup with a notice that was no notice was calculated and was made with the full knowledge that the law constitutionally required the presence of defense counsel. This was no inadvertent "constable's blunder." It is the kind of police conduct *Wade* and *Gilbert* confidently expected to eliminate.

[4] Although a ruling does not appear in the record before us, there is a reference during trial, out of the hearing of the jury, to a ruling of the court which apparently operated to exclude all evidence of the lineup. The ruling must have been made prior to trial.

We have before us therefore the "milder" of the two instances outlined in *Gilbert* where pretrial identification was concededly constitutionally infirm, namely, the instance where a witness identified the suspect at an illegal lineup, but did *not* testify at trial as to the lineup identification. (*Gilbert* v. *California, supra,* 388 U.S. pp. 271-273 [18 L.Ed.2d pp. 1185-1186]; see *In re Carl T.,* 1 Cal.App.3d 344, 350 [81 Cal.Rptr. 655].) In such an instance, the state is entitled to an opportunity which it exercised at bench, to show that the in-court identification has an independent source or that its introduction into evidence was harmless error. (388 U.S. at p. 272 [18 L.Ed.2d at p. 1186].) For the reasons expressed below, I do not think that the in-court identification was based on sources independent of the lineup; moreover, since Sue was the only person who actually saw the robber for a few harassed seconds at the cash register, in view of the vagueness of her identification of appellant immediately after the robbery, I am unprepared to hold the error to be harmless. At the pretrial hearing at which appellant sought to suppress the evidence of the lineup, the pretrial judge summarized the evidence presented. The gist of the court's interpretation of the facts at the pretrial hearing was that Mrs. Chambers and Sue had sufficient time to observe appellant in the store; that both had identified his photograph prior to the lineup; and significantly, the trial judge then found that ". . . the evidence before me is such that their identification is not dependent *merely* upon the lineup itself. . . ." (Italics added.) Additionally, the pretrial judge ruled that the lineup itself had been fair (in a due process sense) other than, of course, the absence of counsel which rendered it illegal. The motion to suppress evidence of the lineup was then denied.

The question at bench is a factual one: in terms of the accepted canons of appellate procedure, is there sufficient evidence in the record to support the conclusion of the finder of fact?

I think that the trial court's finding that Sue's identification of appellant was not *merely* (or only) dependent on the lineup, should have been followed by an order suppressing the evidence. Critical portions of testimony support this finding of the trial court; however, as the majority correctly recognizes the question is whether the in-court identification is ". . . based on observations of the defendant *other than those made at the improper lineup.* (*People* v. *Hagen,* 6 Cal.App.3d 35, 46-47 [85 Cal. Rptr. 556].)" (italics added), and not whether it is at least *partially* based on constitutionally valid identification. As I understand it, the in-court identification must be independent of the illegal lineup. I think that the record demonstrates the contrary in this case.

Thus, at the pretrial hearing, Sue reiterated her testimony given at the

preliminary hearing. Sue was asked whether ". . . you now identify Mr. Collins more from the pictures or more from the lineup when you now identify him as the one who robbed your store . . ." to which she replied "From both now." Shortly thereafter and as the majority notes, she was asked whether ". . . you are identifying him in your mind, you feel three different things, that he is the man who robbed you, that he is the man whom you saw in the photos, and that he is also the man that was at the lineup; isn't that right?" To which Sue again replied with a "Yes."

The fact that Sue's identification was at least in part based on the lineup was also recognized by the prosecution. At trial, during a conference at bench out of the hearing of the jury, the deputy district attorney objected to the defense's cross-examination of Mrs. Chambers on the question of how many times she had observed appellant in person. In arguing that the prosecution should be allowed to introduce evidence of the lineup identification, which would have been, as we have seen, error under *Gilbert* (388 U.S. at p. 273 [18 L.Ed.2d at p. 1186]), the deputy stated: "Now, we know from the hearing that this is just not the case [that Mrs. Chambers did not see appellant between the robbery and the first preliminary hearing], because she is identifying the defendant not from just the Preliminary Hearing, not from the photographs and not from the time she saw him at the robbery, but all the times she saw him *and she saw him at a line-up*, and I think that the jury is entitled to know that this witness is identifying him from a previous occasion that she saw him, physically." (The trial court, however, refused to change its ruling re the lineup and the record nowhere shows that the question objected to was answered.)

The facts as they appear in the record lend considerable support to the determination that the in-court identification was based *at least in part* on the lineup. Although Sue's in-court identification was unequivocal, and one which she adhered to through extensive cross-examination (cf. *People v. Redmond*, 71 Cal.2d 745, 756 [79 Cal.Rptr. 529, 457 P.2d 321]), she, according to her own testimony, observed appellant only for two fleeting seconds as he stood before the register and aimed a handgun at her and as she concurrently ran screaming into the back room where her mother was. Sue's terror-stricken reaction did not, of course, afford her the opportunity for additional observation. Mrs. Chambers did not see the holdup at all. She was in the room in back of the store. The single salient bit of evidence at bench—Sue's opportunity to observe appellant at the scene of the crime—is therefore greatly at variance with other cases where a tainted, or allegedly tainted lineup, was held not to have any impact on the in-court identification.[5]

---

[5]The extensive investigation made by the police graphically illustrates that they

In *People* v. *Hagen,* 6 Cal.App.3d 35, 47 [85 Cal.Rptr. 556], the victim had 45 minutes to observe the defendant; in *People* v. *Grigsby,* 275 Cal.App.2d 767, 774 [80 Cal.Rptr. 294], well over an hour; and in *People* v. *Harris,* 272 Cal.App.2d 88, 90, 95 [77 Cal.Rptr. 123], at least two hours elapsed during which the victim had every opportunity to observe the defendants. At bench, as we have seen, the period of time on which appellant's identification—and the People's entire case—hinged, could be measured only in the panic-stricken seconds of an adolescent's reaction to an unfolding robbery.

I recognize that the record before us contains ample evidence of appellant's in-court identification at the trial. The issue is whether the in-court identification at the trial could have been independent of the lineup, even though evidence of the lineup was not placed before the jury. It is conceded, as it must be, that the lineup was illegal and the evidence of the preliminary hearing shows that the victim depended on the lineup to make identification. "Independent" as used in *Gilbert* (388 U.S. at p. 273 [18 L.Ed.2d at p. 1186]) must mean what it says: the in-court identification must be based on the victim's observation of the suspect at times other than the lineup. The fact that the lineup was not alluded to at the trial does not eliminate the very real testimony of the victim given at the preliminary hearing that she depended on an illegal and tainted lineup. A visualization of the entire series of events beginning with the robbery leads me to the conclusion that the tainted lineup played a primary part in the "in-court" identification of appellant and that it constituted prejudicial error under the circumstances of this case.

I would reverse the judgment.

A petition for a rehearing was denied November 9, 1971, and appellant's petition for a hearing by the Supreme Court was denied December 9, 1971. Peters, J., was of the opinion that the petition should be granted.

---

were not satisfied with the independent evidence of the identification given to them by Mrs. Chambers and Sue. The fact that no lineup was held when appellant was in custody from April 16 to April 18, immediately after the robbery which took place on April 15, indicates that the police had no identification from either Mrs. Chambers or Sue they were willing to trust.